Carl Robert OAKS, #34651, Petitioner,

v.

Wayne K. PATTERSON, Warden, Colorado State Penitentiary, Respondent.

Civ. A. No. 67–C–269.

United States District Court
D. Colorado.

Jan. 16, 1968.

Supplemental Finding Re Jurisdiction
Jan. 22, 1968.

Jay L. Gueck, Denver, Colo., for petitioner.

Duke W. Dunbar, Atty. Gen. for State of Colorado, James F. Pamp, Asst. Atty. Gen., Denver, Colo., for respondent.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

The matter before us is a petition in habeas corpus on behalf of Carl Robert Oaks, who is presently serving a life term in the Colorado State Penitentiary. The petition is filed pursuant to 28 U.S. C. § 2254. Oaks has been granted leave to file *in forma pauperis* and has appointed counsel representing him before this Court. An order has been issued directing the Respondent to show cause why the petition should not be granted. An evidentiary hearing has been held. The

case has been briefed and argued and now stands submitted.

The underlying facts are as follows: On the night of December 20, 1959, a Jefferson County grocer named Thaddeus J. Straub was shotgunned to death at his place of business. There were no witnesses, but a police investigation indicated that the shotgun had been fired through the glass front door of the business. Before he died Straub was able to tell passers-by that the person who shot him was "just a kid," who had threatened to "fill him full of glass" unless he opened the door. Approximately five months later, Jefferson County authorities arrested a 15-year-old youth named Roy Edward Beaty in connection with the Straub murder. Beaty admitted his participation in the crime along with Carl Oaks and two of the latter's step-children. His confession revealed that he was a run-away child living with the Oaks family at the time of the murder,[1] and that Carl Oaks had forced him to participate in the robbery of Straub's Grocery Store by threatening to kill his mother. According to Beaty, Oaks gave him a shotgun and advised him to tell the grocer to "give me your money or else I will give you a belly full of glass." Beaty stated that he, Oaks, and the two children then drove to the grocery store,[2] where he carried out his instructions with Oaks standing near by. The shopkeeper ignored Beaty's threat and began to turn away. Then, in Beaty's words, "the gun went off."

Charges were filed against Oaks and his children and extradition papers were issued.

On June 1, 1960, Carl Oaks and his wife were arrested in Albuquerque, New Mexico, where they had taken up residence approximately two months after the murder. During preliminary questioning, Oaks denied any knowledge of the crime and agreed to waive extradition in an effort to clear the charges against him. On June 2nd, Oaks was taken before a New Mexico district court and a county court as well. He was formally advised of his rights and waived extradition for the two oldest children, Betty Sue and David Lee, who had also been implicated in the crime by Beaty. Mrs. Oaks was then released, and Oaks was later advised that she went to her parent's home in Arkansas with the rest of the children. The following day, Oaks and his two step-children were returned to Colorado, where he confessed and adopted Beaty's confession after approximately nine hours of intermittent questioning over the course of four days.

In October 1960, Oaks was convicted of murder [3] and sentenced to life imprisonment, but his conviction was reversed by the Colorado Supreme Court in Oaks v. People, 150 Colo. 65, 371 P.2d 443 (1962).[4] In January of 1961, Beaty was allowed to plead guilty to the lesser charge of voluntary manslaughter and was senteced to a maximum term of eight years. Late in 1962, Oaks was again convicted and was sentenced to life imprisonment. This conviction was affirmed by the Colorado Supreme Court in Oaks v. People, (Colo.S.Ct.1967) 424 P.2d 115. Oaks then filed a petition for a writ of habeas corpus in this Court.

---

1. Oaks, his wife, and Beaty's father all testified that the boy had come home at least 10 days before the killing and was not living with the Oaks family on December 20th.

2. Beaty first told police that they had walked from the Oaks residence to the grocery store. He altered his confession when the police commented that this would be "quite a walk."

3. C.R.S.1963, 40-2-3 provides:
   "All murder * * * which is com-

mitted in the perpetration or attempt to perpetrate any * * * robbery * * * shall be deemed murder of the first degree."

4. This conviction was reversed because (1) a written confession by Beaty was admitted into evidence although Oaks had not assented to it; (2) Beaty's confession contained statements both immaterial and prejudicial to Oaks; and (3) a psychiatrist was allowed to testify to incriminating admissions made by Oaks during a "consultation."

We observe at the outset that the facts, if true, reveal a sordid, depressing, shocking and senseless crime. At the same time, we are not relieved of our obligation to consider and determine the petition according to law, recognizing and upholding the Petitioner's legal rights if the same have been violated.

Oaks here advances four contentions in support of his petition for habeas corpus relief:

1. that, as an accessory, he was denied due process by being convicted of a greater crime than the principal, Roy Edward Beaty;

2. that the prosecution's use of Beaty's confession, even though it was adopted by Oaks, constituted a denial of his right to cross-examine and confront Beaty at the trial;

3. that his own confession was inadmissible because it was the involuntary product of impermissible police pressure, whereby his rights guaranteed by the Fourteenth Amendment were infringed;

4. that he was subjected to prejudicial pre-trial publicity as a result of the Colorado Supreme Court's opinion in his first appeal, where the Court reversed his conviction but said he was "obviously guilty" and compared him to the fictional character Fagin.

I. *The Accessory Question.*

■ We see no merit in Oaks' contention that his constitutional rights were violated when his codefendant, Beaty, was allowed to plead guilty to voluntary manslaughter whereas he was convicted of murder in the first degree following a trial. He maintains that as an accessory he could not have been convicted of an offense more serious than his accomplice. Apparently the State's theory in allowing Beaty to plead to the lesser crime was that he had acted under the influence of Oaks. The prosecution of Oaks was carried out under the Colorado Accessory Statute, C.R.S.1963, 40–1–12, which defines an accessory before the fact as one who stands by and aids, abets or assists, who, not being present, aiding, abetting or assisting "has advised and encouraged the perpetration of the crime." Such a one is guilty as a principal. It was on this theory that Oaks was convicted as a principal.

■ As we view it, the question is one of substantive criminal law and administration and not one of constitutional right. The State of Colorado has held that the accessory is subject to independent prosecution and can be convicted even though the principal actor has been neither charged nor convicted of an offense. Roberts v. People, 103 Colo. 250, 87 P.2d 251 (1938). Upon this basis an accessory can also be convicted although the principal actor has pled guilty to a lesser included offense. Oaks v. People, Colo., 424 P.2d 115, 117.

We perceive no invalidity and, indeed, no lack of reason in such an interpretation. After all, Oaks was tried on the evidence applicable to him. Where, as here, *he* has had a trial on the true merits he cannot successfully claim violation of constitutional rights based on a concession made to another, which concession was not shown to have been made arbitrarily.

II. *The Right of Confrontation.*

■ Nor do we consider meritorious the argument that introduction into evidence of the Beaty confession, assented to by Oaks, violates the right of the latter to confront and cross-examine a witness against him. We recognize that the Sixth Amendment right which is being invoked applies to the states as part of Fourteenth Amendment due process. Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). And no doubt the *Pointer* case is to be applied retroactively. Nevertheless, Oaks was not deprived of any Sixth Amendment rights because the Constitution does not prohibit the introduction of a co-conspirator's confession assented to by the defendant against whom it is offered. Sparf v. United States, 156 U.S.

51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). And see Lutwak v. United States, 344 U.S. 604, 617–618, 73 S.Ct. 481, 489–490, 97 L.Ed. 593 (1953); United States v. Gardner, 347 F.2d 405 (7th Cir. 1965), cert. den. 382 U.S. 1015, 86 S.Ct. 626, 15 L.Ed.2d 529 (1966); and Tucker v. United States, 279 F.2d 62 (5th Cir. 1960). Such a statement is regarded as the acknowledgment of guilt or confession of the person assenting to it and not the statement of the original declarant, and so the only question to be considered is whether it satisfies the standards of voluntariness required of any and all types of accused statements.

III. *The Question of Voluntariness of the Confession.*

There were two statements of the petitioner which were introduced at the trial. The important one was the confession of Oaks' codefendant, Beaty, which was signed by Oaks. Hearings were held by the trial judge who concluded that the statements were voluntary. We have before us not only the evidence introduced at the trial bearing on this question but also that which was taken at the

evidentiary hearing in this Court. From this we find the facts as follows:

Roy Edward Beaty had been previously arrested and had made a statement implicating petitioner. This resulted in the filing of charges against Oaks and the issuing of a warrant for his arrest.[5] Therefore, Oaks was more than a suspect when he was taken into custody in Albuquerque on June 1, 1960. He was preliminarily questioned with negative results on this occasion. It is noteworthy that his wife and two step-children were also taken into custody. Oaks and the children were then transported to Colorado by Lt. (now Captain) Raymond R. Kechter, chief investigator for the District Attorney, who was then in the Jefferson County, Colorado Sheriff's Offices. Kechter had warned defendant at the outset that he could consult with an attorney and that he had the right to remain silent and anything he said could be used against him. Also, Oaks was taken before both the District Court and the County Court in Albuquerque. Presumably, this was in connection with the extradition. Apparently there was little, if any, interrogation on the trip

---

5. The applicable Colorado Statute then in effect, C.R.S.1953, 39–2–3, provided as follows:

"It shall be lawful for any judge or justice of the peace, upon oath or affirmation being made before him, that any persons have committed any criminal offense in this state, or that a criminal offense has been committed, and that the witnesses have just and reasonable grounds to suspect that such persons have committed the same, to issue his warrant under his hand, commanding the officer or person charged with the execution thereof, to arrest the persons so charged, and bring them before the officer issuing such warrant, or in case of his absence, before any other judge or justice of the peace. The judge or justice of the peace, before whom any person shall be brought in pursuance of such warrant, or shall be brought without warrant, and charged with any criminal offense, before he shall commit such prisoner to jail, admit to bail or discharge him from custody, shall inquire into the truth or probability of the charge exhibited against such pris-

oner by oath of all the witnesses attending, and upon consideration of the facts and circumstances then proved, either shall commit such person so charged to jail, admit him to bail, or discharge him from custody. When the proof is evident, or the presumption is great, that a person charged with treason, murder or any offense punishable by death, is guilty of such crime, no justice of the peace shall admit such person to bail. All recognizances taken in pursuance of this section shall require the accused to appear at and on the first day of the next term of the district court, or if the court be then sitting, on some day of the term to be therein designated."

As far as we are able to ascertain from reading the record, it does not appear that Oaks was ever taken before the Justice of the Peace who issued the warrant. An information was filed in the District Court on June 13, 1960, two weeks after his arrest. He was not arraigned until June 27th. Meanwhile, a lawyer had been appointed and appeared for him at his arraignment.

from Albuquerque to Denver. On arrival at the Jefferson County Jail, June 3, 1960, Oaks was questioned for about an hour and a half. He was allowed to retire when he complained of exhaustion and expressed a desire to pray for guidance before further questioning.

On June 4, 1960, no questioning was conducted.

On June 5, 1960, Oaks was questioned by Kechter for approximately two hours from eleven in the morning to one in the afternoon.

Again on June 6th he was questioned in the late morning for two hours and was given a two hour polygraph test that afternoon. After that test Kechter again questioned him for approximately 45 minutes. Certain oral admissions were made on that latter occasion, but on June 7th when he was questioned for about 45 minutes Oaks at first said he had nothing to do with the incident but later agreed to give a written statement.

On June 7th Roy Beaty made a confession in Oaks' presence. On that occasion Oaks told him that he was not angry at him and it was better for them to tell everything and that he was glad that they were both "getting it off their chests."

On June 8th Oaks signed the written statement which Beaty had given.

Kechter denied that any threats had been used. He conceded, however, that he made some statements concerning the death penalty. Oaks contended that he was exhorted to "be a man about it and confess." Kechter, in his testimony before this Court, recalled asking him "why not be a man about this." Prior to the giving of the confession Oaks asked to see a lawyer and was told by Kechter that only the court appoints lawyers.

At the evidentiary hearing in this Court Oaks stated that while he was confined he could hear his step-children, who were also confined, crying. It does not appear, however, that this would have been possible since the step-children were separated from him. Nevertheless, the children were in custody for seven or eight days to his knowledge.

Thus, we are confronted with a fact situation in which a charge had been filed and the investigation had very much focused on the defendant. The confession was needed to prove the case against him. Although the officers did not mistreat Oaks, they set about accomplishing their objective of obtaining a confession and, indeed, they finally succeeded. Oaks was incarcerated for eight days prior to the signing of Beaty's statement. During this period he was not allowed to consult with anyone except Beaty and, indeed, Beaty was used as a persuader. It is, of course, noteworthy that the questioning was not continuous, rather it was intermittent and occurred during daytime hours.

On the question of an attorney, it is also the fact that Oaks had no money to hire a lawyer and Kechter was without authority or facility to obtain one for him. Thus, the offer of counsel was no more than a gesture.

It can further be concluded that there existed an implied threat to continue the questioning indefinitely until confession was obtained. No relief was in sight as far as Oaks could project it.

It is further noteworthy that Oaks was a borderline mental defective. A clinical psychologist, Dr. Charles R. Shearn, testified that his full-scale intelligence quotient was 76 and that he had a mental age of roughly 12 years. Furthermore, he was unintelligent and poorly educated. Shearn also said that he had low grade intellectual capabilities and was mentally unstable if not mentally ill. He had been discharged from the Army because of bad nerves and was plagued with nervousness, anxiety and feelings of inadequacy. He was a highly dependent person, according to the psychologist, who needed the approval of others. He also was changeable and was subject to suggestion. This is evidenced by sample questions and answers in the confession, which read as follows:

Q. "Mr. Oaks, on the 20th day of December, 1959, the Jefferson County

Sheriff's Office received a report that Mr. Thad J. Straub of 5280 Morrison Road had suffered a gunshot injury. Do you have any knowledge of this incident?"

A. "To my vague knowledge I was there."

\* \* \* \* \* \*

Q. "Mr. Oaks, are the facts that you have just stated to those present here the truth to the best of your knowledge?"

A. "To the best of my knowledge because like I told you before it is a vague knowledge of the whole matter."

Q. "Mr. Oaks, has this statement been free and voluntary?"

A. "It has been more or less voluntary. It has been vague trying to get it. I think you know it has been voluntary. \* \* \* That is as far as I remember and as far as I know. *I followed the other statement as I followed it as much as possible.*" [Emphasis added.]

The question for determination is whether the obtaining of the confessions and particularly the assent to Beaty's statement infringed Oaks' constitutional rights. The trial of this case occurred prior to the decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court has held that *Escobedo* and *Miranda* are not retroactive in their application. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966). Nevertheless, the rulings and the criteria set forth in these cases are relevant on the question of voluntariness. Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

A determination of the present problem requires decision as to whether the confession, judged by the pre-*Miranda*, pre-*Escobedo* standards, must be regarded as involuntary and violative of Oaks' constitutional rights.

Had Oaks' statements been taken subsequent to *Escobedo* and *Miranda,* there would be no issue to discuss. The admitted failure to furnish counsel following Oaks' request would of itself call for a ruling of invalidity. However, since *Escobedo* and *Miranda* are not *retroactive,* the validity of the statements depends on actual voluntariness based on the total attendant facts and circumstances in relationship to the body of Supreme Court precedent prior to *Escobedo* and *Miranda.* The ultimate question is "whether the confession was obtained by coercion or improper inducement," Haynes v. State of Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963) or, in other words, "whether the defendant's will was overborne at the time he confessed." Lynum v. State of Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963).

Some of the many relatively recent Supreme Court decisions which are guides to decision in the case at bar include the following: Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); Johnson v. Commonwealth of Pennsylvania, 340 U.S. 881, 71 S.Ct. 191, 95 L.Ed. 640 (1950); Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); and Haynes v. State of Washington, supra.

In both *Turner* and *Watts* the Court held the confessions there present to be involuntary because of protracted questioning. In *Turner* the defendant was subjected to approximately 23 hours of questioning over a period of five days. At the end of this time he confessed. This was intermittent interrogation and there was no allegation that Turner had been denied food or sleep or that he had been subjected to physical abuse. The Court reasoned that the statement was necessarily the product of pressure and could not be considered voluntary.

In *Johnson*, the confession of Turner's co-conspirator was obtained following six hours of intermittent questioning over a period of five days. The longest single session was one and one-half hours. Here again, there was no evidence of physical or psychological coercion. Yet the Supreme Court summarily held the confession involuntary. We read this relatively early decision as indicating that a lengthy and indeterminate detention, during which questioning is conducted, may itself render the statement involuntary.

More closely comparable to the present case are Fikes v. State of Alabama, supra, and Culombe v. Connecticut, supra. In *Fikes* the evidence disclosed that the defendant was a poorly educated, emotionally unstable and highly suggestible suspect. He gave confessions after having been questioned in sessions of several hours' duration over a period of five days. These questioning sessions were undoubtedly more intense than those which were conducted in the present case, but as in the case at bar Fikes was repeatedly advised of his constitutional rights; he at no time requested an attorney. On its face the confession which he gave consisted in a large degree of "yes" and "no" answers to leading questions and, thus, it resembles in that respect the statement of Beaty which was assented to by Oaks.

In *Culombe* the subject was a suspect of subnormal mentality. He was subjected to 12½ hours of intermittent questioning which lasted for five days. Here the officers failed to advise him of his constitutional rights and his request for legal counsel was refused. The Supreme Court's holding that the confession was involuntary was based on the prolonged and indefinite detention together with the denial of his request for counsel.

Haynes v. State of Washington, supra, is the latest and also the most far-reaching of the entire group of decisions.[6] In *Haynes* the period of detention was relatively short—eighteen hours. The defendant was arrested shortly after the robbery of a service station. He orally admitted his guilt to the arresting officers while en route to the police station. After arrival at the station he was questioned for an hour and a half and again he orally admitted his guilt. The next morning, starting at approximately 9:30, Haynes was again questioned for about an hour and a half. This time he refused to give a written statement until he could call his wife and an attorney. He was informed that he could not make a telephone call until he cooperated. Following this he again confessed and signed a transcribed statement. Soon after that he was taken before a magistrate for preliminary hearing. Notwithstanding the short duration of the questioning, the Supreme Court held the confession involuntary on the ground that he had been expressly threatened with incommunicado detention and on the further ground that he had been promised access to a telephone if, and only if, he made and signed a statement. The Court said that these factors sufficiently demonstrated that the confession was induced by coercive influences and was not a product of the free and unconstrained will of the subject.

We glean from the above cases and from *Escobedo* and *Miranda* that the following factors, singly or together, have been important in deciding this voluntary-involuntary issue.

1. Whether the accused is the subject of the investigation—has it focused on him?

2. Whether there was questioning in an atmosphere of incommunicado incarceration.

6. *Haynes* had not been decided when the Oaks questioning was conducted. There is no evidence to indicate that it is prospective in effect. The voluntary-involuntary evaluation has not been so treated. See Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961). Herein the petitioner had been convicted some 20 years earlier and contemporary decisions were applied to that early conviction.

3. Whether questioning sessions have been protracted.

4. Whether the period of the incarceration has been lengthy. (It is to be noted, however, that in *Haynes* the period was but eighteen hours).

5. Whether the accused has been advised of his right to counsel and warned that he has a right to remain silent.

6. Has the accused had access to counsel or to members of his family?

7. Whether subtle coercive pressures have been used.

8. The mental condition of the accused. Is he weak or strong, neurotic, emotionally stable or unstable?

Judged by these guides and criteria, we are convinced that both of the Oaks statements were involuntary and invalid.

The factors present in the case at bar can be summarized as follows:

The eight day period of incommunicado detention raises a serious question at the very outset. The offer of counsel and at the same time the refusal to grant his request for counsel until he went to court also weighs heavily.

There were subtle pressures. The Oaks step-children were in custody and his codefendant, a 15-year-old boy, was used to bring pressure on him.

The statements themselves fail to demonstrate either spontaneity or volition on the part of Oaks. Oaks' mental makeup rendered him peculiarly suggestible and susceptible to pressure.

The statement was essential to a conviction. His "testimony" was indispensable to a finding of his guilt.

Throughout the investigation the focus was on Oaks. From the outset the officers were convinced of his guilt and they set about obtaining the necessary evidence from him.

■ In the Supreme Court cases which we have examined one or more of the numerous cited factors were present. Although in the case at bar we do not find day long or night long questioning, we do find several of the factors which the Supreme Court has recognized as strong indicators of coercion. The presence of these factors in combination in the case at bar makes the conclusion inescapable that the confessions were obtained by coercion and were therefore involuntary.

It is therefore adjudged that the Order to Show Cause heretofore issued be made absolute. It is ordered that the Petitioner be released from custody unless the State determines within thirty days to retry the Petitioner. A stay of execution of this order is granted to the Respondent for the thirty day period.

## SUPPLEMENTAL FINDING RE JURISDICTION

This finding supplements our memorandum opinion and order of January 16, 1968, which failed to set forth the bases upon which we assumed jurisdiction in this case.

■ Jurisdiction exists by virtue of 28 U.S.C. § 2254. Petitioner had exhausted his state remedies with regard to all his contentions, with the exception of his fourth contention, which alleged that his constitutional rights had been violated by certain prejudicial pre-trial publicity. The Colorado Supreme Court was not given an opportunity to pass on that question, since the voir dire record was not before it. The constitutional question of the voluntariness of Oaks' confession, upon which our writ of habeas corpus was issued, was extensively briefed and presumably argued before the Colorado Supreme Court. Thus, Petitioner's remedies with regard to this question were exhausted, even though the question was not the subject of lengthy discussion in the State Supreme Court's opinion.